UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

TONI G. LOGAN,

                Plaintiff,           07 Civ. 4150

     -against-                  OPINION

MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

                Defendant.

----------------------------------X

A P P E A R A N C E S:

              Attorneys for Plaintiff

              INSLER & HERMANN, LLP
              80 Grasslands Road, Suite 102
              Elmsford, NY  10523
              By:  Gabriel J. Hermann, Esq.

              Attorneys for Defendant

              MICHAEL J. GARCIA
              United States Attorney for the
                Southern District of New York
              86 Chambers Street, 3rd Floor
              New York, NY  10007
              By:  Susan D. Baird, Esq.
                  Assistant United States Attorney

USDC SDNY
DOCUMENT
ELECTRONICALLY FILE
DOC #:
DATE FILED: 9/8/08

**Sweet, D.J.**

Plaintiff Toni G. Logan ("Logan" or the "Plaintiff") has moved under Rule 12(c) F. R. Civ. P. for judgment on the pleadings to review and reverse the decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying Logan disability insurance benefits. The Commissioner has cross-moved for judgment on the pleadings dismissing Logan's complaint. As set forth below, the motion of Logan is denied, the cross-motion of the Commissioner is granted and the complaint is dismissed.

## I.   PRIOR PROCEEDINGS

Logan filed an application with the Social Security Administration ("SSA") for disability insurance benefits on March 17, 2005. The application was denied and she requested a hearing before an Administrative Law Judge ("ALJ"). The hearing was held on November 8, 2006, with Plaintiff and her attorney present. On November 17, 2006, the ALJ reviewed the case de novo and found that Logan was not disabled. This decision became the final decision of the Commissioner on March 26, 2007, when the Appeals Council denied Plaintiff's request for review.

The complaint in this action seeking review of the Commissioner's decision was filed on May 29, 2007.  The instant motions were heard and marked fully submitted on March 26, 2008.

**II.  FACTS**

Logan alleges that she has been disabled since January 17, 2005, due to chronic fatigue and immune deficiency syndrome, migraine headaches, and a sleep disorder.

Logan was born in August 1955 and was fifty-one years old at the time of the ALJ's decision on November 17, 2006.  She reported that she had completed four years of college, and had worked as a free-lance writer, which required sitting for five hours per day, standing for one hour per day, walking for two hours per day, and lifting no weights.  She stated that she had also worked as a researcher/fact checker, which required lifting less than ten pounds, standing for two hours, and sitting for six hours.  In addition, Logan reported that she had worked as a reporter, which required lifting less than ten pounds, walking for two hours, standing for two hours, and sitting for four hours.

2

On April 13, 2005, SSA employee Edith Ruiz-Cisnero, who assisted Logan with her application, recorded their interaction during their telephone conversation. Logan was coherent, able to answer questions without problems, and had no problems understanding, concentrating, talking, or answering questions.

On an April 26, 2005 questionnaire, Logan stated that she had some good days and some bad days. She reported that on some days she stayed in bed due to her fatigue. On other days, she reportedly worked part-time for one to two hours, took a lunch break, and resumed working. She stated that she also cooked dinner, cleaned up, washed dishes, and cleaned the bathroom. She left the house to run errands, go to the bookstore, go grocery shopping, visit a friend, or meet with a tax adviser.

In her leisure time, Logan went on short hikes about twice per year, and would "go for a long walk if it's a nice day." She also went to museums, and on occasion, met a friend for coffee, and went out to dinner with her husband once a month. She also participated in a twelve-step program. She stated that she went to a hair salon every ten weeks to have her hair colored, but claimed that she had developed an intolerance

3

to the chemicals, and that she was sometimes unable to function the next day because of her symptoms.

In addition, Logan reported that in July 2005, she took a cross-country driving trip with her husband, stopping in Colorado and Missouri to visit relatives, and moving their belongings in conjunction with their move from California to New York. Richard Defendorf, Logan's husband, stated in another questionnaire that Logan's energy level and condition were unpredictable from day to day. He stated that she sometimes went to dinner parties, cocktail parties, or music events that lasted two to three hours, but if the event ran longer, she would not go. He stated that on a good day, she could hike one or two miles, she did not shop for more than two hours without stopping to rest and that she answered a hotline for a twelve-step program for an hour or two about twice a year.

At the hearing, Logan testified that she had headaches, a sleep disorder, and cognitive problems. She stated that whenever she exerted herself, she would need time to recover. She also reported that she had a problem with her left shoulder, had diarrhea and constipation and took a low dosage of Wellbutrin for mood swings and "mental clarity," which helped.

4

Logan testified that she worked as a newspaper
reporter, grant writer, fact checker, and free-lance writer, she
did not work in 2002 due to her medical conditions, but worked
in 2003 and 2004, and then stopped working again in 2005.

Victor Alberigi, a vocational expert ("Alberigi")
testified at the hearing that Logan's past work as a fact
checker, researcher, editor, and writer were skilled and mostly
sedentary, although her work as a news writer was light work.
The ALJ asked Alberigi whether a hypothetical individual could
perform any of Logan's past work if she was limited to light
work that required occasional postural activities and only
occasional overhead reaching.  Alberigi testified that such
person could perform all of Logan's past work.

**Medical Evidence**

Dr. Gwynn Simon ("Dr. Simon")

Logan was seen by Dr. Simon, a specialist in
infectious diseases, on May 10, 2005.  Logan told Dr. Simon that
her complaints of headaches and inability to sleep began in 1990
or 1991.  She complained of fatigue, but stated that she went
for walks despite the fatigue, that she felt depressed due to

5

her fatigue, but that the medication Wellbutrin was helping with
the depression and mental fogginess.

On examination, Logan's chest was clear.  There were
no heart murmurs, and the abdomen was negative.  Reviews of her
head, eyes, ears, nose and throat were also negative.  An
examination of her extremities was also negative, and an
examination of her lymph nodes revealed that none were palpable.
Dr. Simon stated that based on her symptoms, Logan fulfilled the
criteria of chronic fatigue syndrome.  The doctor stated that
she was "disabled from her illness."

### Cecelia Hardy, Ph.D. (Dr. Hardy)

Logan was examined by Dr. Hardy on June 1, 2005, in
Oakland, California.  On intelligence testing, she obtained a
verbal IQ of 130, a performance IQ of 117, and a full scale IQ
of 127.  Dr. Hardy concluded that Logan was performing in the
superior range of cognitive abilities and acknowledged that
plaintiff seemed to tire as the testing wore on, but nonetheless
concluded that she had the cognitive ability to work in any
field that she wished to.  Dr. Hardy also stated that Logan did
not appear to be clinically depressed and, in fact, denied
having any depression.

6

Dr. Jenna Beech ("Dr. Beech")

On June 7, 2005, Logan was examined by Dr. Beech, in Oakland, California, at the Commissioner's request. Dr. Beech observed that she sat in her chair comfortably and had no gross mobility or dexterity limitations, could bend down to pick something off the floor, open the door, and manipulate the buttons on her shirt with ease. A comprehensive examination of Logan's eyes, neck, nodes, chest, lungs, cardiovascular system, and pulses was unremarkable. Her coordination, station, and gait were normal, straight leg raising was negative, there was no paravertebral tenderness or spasm, her motor strength was full, at 5/5, and her sensory system was intact.

Dr. Beech acknowledged Logan's history of chronic fatigue, but stated that her physical examination was normal. Dr. Beech assessed that Logan's standing, walking and sitting were limited to six hours in an eight-hour day. The doctor stated that standing and walking should not be done for more than fifteen minutes because of fatigue. Dr. Beech opined that Logan could lift and carry twenty pounds and that she should not do postural activities for more than fifteen minutes at a time.

Dr. Eileen Kim ("Dr. Kim")

On June 15, 2005, Logan had a magnetic resonance scan ("MRI") of the brain, at the request of Dr. Kim, to evaluate her headaches and asymmetric pupils. No mass, lesion, or findings of hemorrhage were noted. A "T2 hyperintense signal" was seen, which was thought to be a non-specific finding possibly related to small vessel ischemic disease.

Dr. Craig Smith ("Dr. Smith")

On June 15, 2005, Dr. Smith, a state agency medical consultant, reviewed the medical evidence of record in Oakland, California. He concluded that Logan did not have a severe psychiatric impairment.

Dr. Nayan Gordon ("Dr. Gordon")

On June 27, 2005, Dr. Gordon, a state agency physician, reviewed the medical records with respect to Logan's physical complaints. Dr. Gordon opined that despite her impairments, including fatigue, Logan could: (1) occasionally lift twenty pounds, (2) frequently lift ten pounds, (3) stand and walk about six hours in an eight-hour workday, (4) sit about

8

six hours in an eight-hours workday, and (5) push and pull without limitation, and that she could frequently balance, and could occasionally climb, stoop, kneel, crouch, and crawl. The doctor stated that Plaintiff had no manipulative limitations, such as in reaching.

### Dr. Derek Enlander ("Dr. Enlander")

Dr. Enlander, of New York, New York, treated Logan during the period August 2005 through October 2006. On January 4, 2006, Dr. Enlander completed a form entitled, "Epstein-Barr Virus/Chronic Fatigue Syndrome/Lyme Disease and other related disorders Functional Capacity Assessment," at the request of Logan's attorney. He checked boxes to indicate that he had treated Logan since August, 2005, for chronic fatigue syndrome/chronic fatigue and Immune Dysfunction Syndrome, Epstein-Barr Virus, and fibromyalgia and filled in the form to indicate that she could walk for only one block, could sit, stand and walk for only one hour in an eight-hour workday, and could occasionally lift only five pounds. He also completed other parts of the form to indicate the Logan would need to lie down four to six times per day, and would need to avoid wetness, noise, fumes, temperature extremes, humidity, dust, and gases.

In an undated questionnaire, Dr. Enlander reported that he had treated Logan since August 24, 2005, and indicated that she was incapable of performing her regular work, but should be able to resume her work in February, 2006.

On October 3, 2006, Dr. Enlander completed another form regarding Logan's ability to perform work-related activities, stating that she could only occasionally lift less than ten pounds, could lift no amount of weight frequently, and that she could stand and walk less than two hours in an eight-hour workday, could sit less than six hours per day, and was limited in her ability to push with both upper and lower extremities.  Dr. Enlander opined that Logan could occasionally climb, but could never balance, kneel, crouch, crawl, or stoop. He stated that she had a limitation in her ability to reach, handle, feel, see, hear, and speak, and that she had environmental limitations, such as limitations with respect to temperature extremes, noise, dust, vibration, humidity, wetness, hazard, fumes, odors, chemicals and gases.

Katonah Medical Group

Logan received treatment at the Katonah Medical Group, in Katonah, New York, during the period of September, 2005,

10

through October, 2006. On November 14, 2005, Dr. Eric Rudin

("Dr. Rudin") examined Logan. Dr. Rudin described Logan as

pleasant and in no acute distress. Her thyroid was palpable,

but not nodular and not enlarged, and a review of her heart

revealed regular rate and rhythm, normal sounds, and no murmurs.

Her lungs were clear to auscultation, her abdomen was soft,

nontender, and not distended and her extremities revealed no

cyanosis, clubbing, or edema. Dr. Rudin noted that laboratory

results from August 24, 2005, revealed normal TSH and T4, and a

slightly decreased thyroxin index. Repeat testing on September

20, 2006, was within normal range.

On April 5, 2006, Logan had a colonoscopy, to evaluate

her history of alternative diarrhea and constipation which

revealed diverticulosis and colon polyps.

On August 2, 2006, x-ray of the left shoulder revealed

mild degenerative arthritis of her acromioclavicular ("AC")

joint, with no fracture or osseous lesion.

On October 9, 2006, an MRI of her left shoulder

revealed severe tendinosis, with the possibility of a surface

tear not entirely excluded, and minimal AC joint arthropathy.

On October 19, 2006, plaintiff was evaluated for her left

11

shoulder complaints.  Dr. Yasgur recommended left-shoulder
arthroscopic subacrominal decompression.

### Dr. Carl E. Rosenkilde ("Dr. Rosenkilde")

On March 17, 2006, Logan was examined by Dr.
Rosenkilde.  Dr. Rosenkilde found no evidence of a cognitive
impairment.  When evaluating Logan's cranial nerves, he noted
that one pupil was larger than the other, her gait was normal,
and her motor strength was full, at 5/5.  The doctor noted a
"mild" tremor in the left arm and that her vibration sense was
also "minimally" impaired.  There was normal range of motion of
the neck and back.  Dr. Rosenkilde thought that Logan's
neurological complaints may be related to undiagnosed multiple
sclerosis or to hyperlipidemia with hypertensive disease.  He
recommended that her blood pressure, which was 150/90, needed to
be monitored closely, and perhaps treated with hypertensive
medication.

On May 2, 2006, Logan underwent a sleep study that
revealed that she had significant leg movement during the night
and borderline sleep apnea.  She slept for about three hours of
the eight and one-half hours she was at the laboratory.  During
the night, she had 45 arousals due to respiratory disturbance.

There were also at least four sequential leg movements 28 times
an hour.   The examiner recommended a weight reduction and
medication for the leg movement.

### Chiropractors

On July 27, 2005, Sallie MacNeill, a chiropractor
("MacNeill") reported that she had treated Logan for problems
with her back, neck, and feet since November 7, 1995, and for a
right shoulder sprain since January, 2001.   MacNeill stated that
she did not do a functional assessment of Logan's work ability,
but had "observed a gradual decline in her tolerance for all
activity" and stated that Logan "no longer seemed able to
function in a manner reliable enough to maintain a job," and "I
support her application for long term SSDI."

On September 26, 2006, Stuart Weitzman ("Weitzman") a
chiropractor, completed a form to assess Logan's ability to do
work-related activities and opined that she could lift less than
ten pounds on an occasional basis, based on her statements that
she needed to distribute her groceries into many bags, and that
her cookware was too heavy to hold.   Weitzman assessed that
Logan could stand and walk for approximately three hours, with
breaks, in an eight-hour workday and opined that she had to

13

alternate sitting and standing.  He stated that she could
occasionally climb and balance, but could not kneel, crouch,
crawl, or stoop and indicated that she had a limited ability to
reach because of a left shoulder problem.

## III. DISCUSSION

### A.    Standard of Review

The Social Security Act provides that the "findings of
the Commissioner as to any fact, if supported by substantial
evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).  See
also Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez v.
Chater, 77 F.3d 41, 46 (2d Cir. 1996).  Substantial evidence
means "more than a mere scintilla.  It means such relevant
evidence as a reasonable mind might accept as adequate to
support a conclusion."  Richardson, 402 U.S. at 401 (quoting
Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Halloran
v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004).  The substantial
evidence test applies to the inferences and conclusions drawn
from basic evidentiary facts as well as the facts themselves.
Murphy v. Sec'y of HHS, 62 F. Supp. 2d 1104, 1106 (S.D.N.Y.
1999).

In assessing whether the evidence supporting the
Secretary's position is substantial, the Court does not look at
that evidence in isolation but rather will view it in light of
other evidence that detracts from it.  Alston v. Sullivan, 904
F.2d 122, 126 (2d Cir. 1990).  However, if the Court finds that
there is substantial evidence supporting the Commissioner's
determination, the Commissioner's decision must be upheld, even
if there is also substantial evidence for the plaintiff's
position.  Id.; see also DeChirico v. Callahan, 134 F.3d 1177,
1182 (2d Cir. 1998) (Commissioner's decision affirmed where
substantial evidence for both sides).

## B.    The Commissioner's Disability Determination Is
##       Supported by Substantial Evidence

In order to establish disability under the Social
Security Act, a claimant has the burden of establishing
"inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than 12 months," 42 U.S.C. § 423(d)(1)(A), and the
impairment must be of "such severity that [s]he is not only
unable to do [her] previous work but cannot, considering [her]

15

age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."

Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (quoting 42

U.S.C. § 423(d)(2)(A)).

The Commissioner's regulations prescribe a five-step

procedure for evaluating disability claims. See 20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4).

> Step one asks if the claimant is currently
> engaged in "substantial gainful activity." Step
> two asks if the claimant's impairment is
> "severe." Step three asks if the impairment
> appears in the "Listing of Impairments," 20
> C.F.R. Part 404, Subpart P, App. 1. Step four
> asks if the claimant can still do "past relevant
> work." Step five asks if the claimant "can make
> an adjustment to other work," with reference to
> the "Medical Vocational Guidelines" ("the
> Grids"), 20 C.F.R. Part 404, Subpart P, App. 2,
> Tables 1-3.

Williams v. Comm'r of Soc. Sec., 236 Fed. Appx. 641, 643 (2d

Cir. 2007). If the claimant shows that her impairment renders

her unable to perform her past work, the burden shifts to the

Commissioner to show there is other gainful work in the national

economy which the claimant could perform. Belsamo, 142 F.3d at

80; Carroll v. Sec'y of HHS, 705 F.2d 638, 642 (2d Cir. 1983).

The ALJ evaluated Logan's claim pursuant to these five

steps and found that she had severe impairments of chronic

fatigue syndrome/fibromyalgia and left shoulder impingement, that her mental impairment, migraine headaches and diverticulitis were not severe, and that her impairments did not meet or equal the requirements of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Upon the evidence of record, the ALJ concluded that Logan retained the residual functional capacity for light work that did not require postural activities more than occasionally, and did not require overhead reaching with her left arm more than occasionally. Pursuant to 20 C.F.R. § 404.1520(e), the ALJ then compared Logan's residual functional capacity with the demands of her past relevant work as a free-lance writer, editor, researcher, and fact checker, and concluded that Logan retained the ability to perform her past relevant work. Accordingly, the ALJ found that Logan was not disabled.

Logan first challenges the ALJ's determination that her mental impairment, headaches, and diverticulitis were not severe impairments. See Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, dated December 21, 2007 ("Pl. Br.") at 23-25. An impairment is "not severe" if the medical evidence establishes only a slight abnormality or combination of slight abnormalities which do not significantly limit an individual's ability to perform basic work-related

17

activities. 20 C.F.R. § 404.1521. Basic work-related activities include physical requirements such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying and handling. Id. Basic work activities also include the mental ability to: (1) understand, carry out, and remember simple instructions, (2) use judgment, (3) respond appropriately to supervision, co-workers and usual work situations, and (4) deal with changes in a routine work setting. Id.

The ALJ's finding that Logan's mental impairment was not severe is supported by substantial evidence. The ALJ relied upon Dr. Hardy's opinion that she was performing in the superior range of cognitive abilities and had the cognitive ability to work in any field that she wished. Dr. Hardy also stated that Logan did not appear to be clinically depressed and in fact denied being depressed.

Dr. Craig Smith, who reviewed the medical evidence, opined that Logan did not have severe psychiatric impairment. Dr. Rosenkilde, after examining Logan, also opined that she did not have a cognitive impairment. Logan stated to Dr. Beech that although she felt depressed because of her limitations, she did not consider herself a depressed person. Finally, Ms. Ruiz-Cisnero reported that Logan was able to answer questions without

18

problems, and had no problems understanding, concentrating, talking, answering, or with coherency. This evidence was sufficient to support the ALJ's finding of no mental impairment.

Although the ALJ found that Logan had other severe impairments related to her chronic fatigue syndrome/fibromyalgia and left shoulder problem, he found that Logan could nonetheless perform light work that did not require postural activities more than occasionally, and did not require overhead reaching with her left arm more than occasionally.

The examination findings and opinion of Dr. Beech supported the ALJ's residual functional capacity assessment. Dr. Beech found that Logan's physical examination was normal. Dr. Beech assessed that Logan could lift twenty pounds and opined that she could stand, walk and sit for six hours. Since light work requires standing and walking, off and on, for approximately six hours in an eight-hour day, and sitting for the remaining time, Dr. Beech's opinion is consistent with the requirements of light work. See Titles II and XVI: Determining Capability To Do Other Work -- The Medical-Vocational Rules of Appendix 2, S.S.R. 83-10, 1983 WL 31251, at *5 (1983) (light work requires standing and walking for about six hours in an eight-hour day). Dr. Beech's opinion that Logan should not do

19

prolonged postural activities was also consistent with the ALJ's finding that Logan should not do postural activities more than occasionally.

Dr. Gordon opined that Logan could occasionally lift twenty pounds, could frequently lift ten pounds, could stand and walk for about six hours in an eight-hour workday, could sit about six hours in an eight-hour workday, and could push and pull without limitation. Dr. Gordon also opined that she could frequently balance, and could occasionally climb, stoop, kneel, crouch, and crawl, and found that she had no manipulative limitations, such as overhead reaching.

Upon examination, Dr. Rudin described Logan as pleasant and in no acute distress. Examination of Logan's heart revealed regular rate and rhythm, normal sounds, and no murmurs. Her lungs were clear to auscultation, and her abdomen was soft, nontender, and not distended. Her extremities revealed no cyanosis, clubbing, or edema. Dr. Rudin's findings were generally benign.

Dr. Rosenkilde reported that on examination, Logan's gait was normal. Although he noted a "mild" tremor in the left arm and mild vibration loss, he reported that she had full motor

20

strength, and she had normal range of motion of the neck and
back.

The opinions of Drs. Beech and Gordon, and the minimal
findings of Drs. Rudin and Rosenkilde, support the finding that
Logan could do a limited range of light work.

Logan has contended that the ALJ improperly
disregarded the opinion of her treating physician, Dr. Enlander,
that she had a restricted residual functional capacity.  See Pl.
Br. at 16-27, 30-32, 35-39.  The ALJ considered Dr. Enlander's
opinion, and provided an explanation for why he did not accord
significant weight to the opinion.  Under the Commissioner's
regulations, a treating source's opinion on the issues of the
nature and severity of an individual's impairment will be given
controlling weight only if the opinion is well-supported by
medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with other substantial
evidence.  20 C.F.R. § 404.1527(d); see Green-Younger v.
Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (applying treating
physician rule in fibromyalgia case).

The ALJ stated that Dr. Enlander's opinion of such
severe restrictions was not supported by clinical examinations

and findings, but rather appears to be based upon Logan's own subjective reports of pain and fatigue,[1] and was contradicted by other substantial evidence of record.

The ALJ relied, in part, upon the examination findings and opinion of Dr. Beech, who found that Logan's physical examination was "normal," but nonetheless provided a functional assessment based "largely on her history" of chronic fatigue syndrome. Consistent with the requirements of light work, Dr. Beech assessed that Logan could lift twenty pounds, and could stand, walk and sit for six hours each in an eight-hour day. Dr. Beech's opinion is consistent with a determination that Logan is capable of light work, and contradicts Dr. Enlander's opinion.

The ALJ also relied upon the opinion of Dr. Gordon, the state agency physician who reviewed the medical evidence of record. Dr. Gordon opined that Logan could occasionally lift twenty pounds, could frequently lift ten pounds, and could stand, walk or sit about six hours in an eight-hour workday. A

_____

[1] Plaintiff argues that the abnormal sleep study was an "objective test" that evidenced her diagnosis of chronic fatigue syndrome. Pl. Br. at 22. The sleep study showed that plaintiff slept a total of only about three hours, with a sleep efficiency rate of 36 percent. The interpretation of the sleep study was periodic limb disorder with an index of 28 times an hour, and borderline sleep apnea with an apnea/hypopnea index of five events an hour, an interpretation that would provide an alternative explanation for Logan's complaints of chronic fatigue. The study was not conducted at Dr. Enlander's direction and his opinion does not rely upon it.

state agency medical consultant, Dr. Gordon is an expert in the evaluation of medical issues in disability claims under the Act, and his opinion constitutes expert opinion evidence that can be given weight when it is supported by medical evidence of record. 20 C.F.R. § 404.1527(f); Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (opinion of nonexamining source may override treating source's opinion where supported by evidence of record); Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993) (same).

The ALJ also relied upon the examination findings of Drs. Rudin and Rosenkilde. Dr. Rudin, who evaluated Logan to determine whether she had thyroid disease, found that she was in no acute distress. His review of Logan's heart revealed regular rate and rhythm, normal sounds, and no murmurs. Her lungs were clear to auscultation and her abdomen was soft, nontender, and not distended. Her extremities revealed no cyanosis, clubbing, or edema. A neurological review revealed no tremor and equal reflexes. Dr. Rudin's findings did not indicate that Logan had any limitations beyond those found by the ALJ.

Dr. Rosenkilde also reported largely benign findings. On examination, Logan's gait was normal. Although he observed a "mild" tremor in the left arm and mild vibration loss, he found

that her motor strength was full, and that she had a normal
range of motion of the neck and back.

The opinions of Drs. Beech and Gordon, and the
findings of Drs. Rudin and Rosenkilde were sufficient evidence
for the ALJ to reasonably determine that Dr. Einlander's opinion
was unreliable, and find that Logan could do a range of light
work.  See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)
(genuine conflicts in the medical evidence are for the
Commissioner to resolve); Mongeur v. Heckler, 722 F.2d 1033,
1039 (2d Cir. 1983) (opinion of consulting physician may provide
substantial evidence to contradict treating physician opinion).

Logan also contends that the ALJ was required to give
the opinion of Dr. Simon controlling weight.  Pl. Br. at 17-23,
31.  However, to the extent that Dr. Simon opined that Logan has
chronic fatigue syndrome, the ALJ accepted that diagnosis.
However, the ALJ had no obligation to accept Dr. Simon's opinion
that Logan was "disabled."  A physician's statement that an
individual is or is not disabled is a statement on an issue
reserved to the Commissioner and is not entitled to any special
significance.  20 C.F.R. § 404.1527(e); Snell v. Apfel, 177 F.3d
128, 133 (2d Cir. 1999) ("A treating physician's statement that
a claimant is disabled cannot itself be determinative.").

Nor, as Logan argues, was Dr. Simon's opinion entitled to the weight accorded a treating physician's opinion. See Pl. Br. at 17-023, 31. Dr. Simon examined Logan on only one occasion. In contrast, a treating physician is a physician who has seen a claimant "a number of times," and long enough to have a longitudinal picture of the claimant's medical impairment. 20 C.F.R. § 404.1527(d)(2)(i). A doctor who examines a claimant once or twice is not a treating physician. Mongeur v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983). Because Dr. Simon examined Logan on only one occasion, she is not a treating physician and her opinion is not entitled to special weight.

The fact that the ALJ did not summarize Dr. Simon's report, which was one of many in a 658-page record, does not mean that he did not consider it. An ALJ is not required to explicitly set forth and analyze every piece of evidence in the record. See Monguer, 722 F.2d at 1040; Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981) (holding that ALJ is not required to reconcile every conflicting shred of medical testimony); see also Barringer v. Commissioner of Social Security, 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005) ("[A]n ALJ is not required to discuss all the evidence submitted, and [his] failure to cite specific evidence does not indicate that it was not considered." (second

alteration in original) (quoting Craig v. Apfel, 212 F.3d 433, 435 (8th Cir. 2000)).

Logan has also contended that the ALJ improperly disregarded the opinions of her two chiropractors, Weitzman and MacNeill. Pl. Br. at 18-23 and that the failure to consider Weitzman's chiropractic records and findings "constitutes error." Pl. Br. at 19. Chiropractors are not acceptable medical sources, 20 C.F.R. 404.1513(a), and their opinions are not medical opinions. Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995). However, the ALJ did specifically consider both Weitzman and MacNeil's records and findings, noting that Weitzman's assessment was based on Logan's own subjective reports and that McNeill provided no assessment of Logan's condition, but stated that she "support[ed] her application for long term SSDI." Based on this analysis, the ALJ did not err in concluding that the chiropractors' opinions were not controlling.

Logan also urges that the ALJ incorrectly rejected her complaints of disabling symptoms. Pl. Br. at 27-31. However, the ALJ did not reject her complaints of symptoms. Rather, the ALJ found that Logan's impairments could reasonably be expected to produce certain symptoms, but that her statements concerning

the intensity, persistence, and limiting effects of her symptoms
were not credible to the extent alleged.  Under the Social
Security Act, subjective symptoms alone cannot be the basis for
a finding of disability.  42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §
404.1529.  Where the symptoms alleged suggest a greater
restriction of function than can be demonstrated by objective
evidence alone, the Commissioner considers other evidence in
assessing the claimant's credibility, such as a claimant's
statements, daily activities, duration and frequency of pain,
medication, and treatment.  20 C.F.R. § 404.1529(c)(3).
Although Logan suggests that because she has chronic fatigue
syndrome, her subjective complaints are entitled to more weight,
Pl. Br. at 28-30, the ALJ is required to evaluate her
credibility in accordance with the factors set forth at 20
C.F.R. § 404.1529(c)(3); see also Aponte v. Secretary of Health
and Human Services, 728 F.2d 588, 591 (2d Cir. 1984).  After
weighing the objective evidence, the claimant's demeanor, and
other indicia of credibility, it is for the ALJ to resolve
conflicting evidence, and it is within his authority to
discredit a claimant's subjective estimate of the degree of an
impairment.  See Pascariello v. Heckler, 621 F. Supp. 1032, 1036
(S.D.N.Y. 1985).

The ALJ acknowledged Logan's testimony about her symptoms, including headaches and fatigue, and provided a cogent explanation for finding her not fully credible. The ALJ found that the medical documentation, including information from Drs. Beech, Rudin, and Rosenkilde, which resulted in minimal findings, did not support her allegations. The ALJ also evaluated Logan's activities of daily living, as required by 20 C.F.R. 404.1529(c)(3), and observed that she was "fairly functional." As the ALJ pointed out, Logan drove cross-country with her husband in July, 2005, stopping in Colorado and Missouri to visit relatives, in connection with a move from California to New York. The ALJ also observed that despite her impairments, Logan could cook, do laundry, drive, shop, and use public transportation by herself. She also cooked dinner, washed dishes and cleaned the bathroom. She ran errands, shopped for several hours at a time, and went to the bookstore. She also went for "a long walk" on nice days, and went on short hikes about twice a year, hiking up to two miles on a good day. She also reported other activities, such as going to museums, going out to dinner with her husband, going to dinner parties and cocktail parties, going out for coffee or a short outing with a friend, and going to a hair salon every ten weeks. In addition, Logan reported that she worked part-time during the time that she alleged she was disabled.

28

Although Logan contends in her brief that she had good days and bad days, and engaged in activities only on her good days, Pl. Br. at 29, her wide range of daily activities raised questions about her credibility. Moreover, her statements throughout the record do not support her allegations that she only engaged in activities on a few "good" days. Although Logan reported that she had headaches, she stated hat the headaches occurred only twice per month. She also admitted that her fatigue did not preclude her from going for walks. Fatigue also did not preclude her scoring in the superior range on an intelligence testing. Moreover, Logan stated that her sleep disorder, and presumably the sleep-related fatigue, was helped by medication.

Furthermore, as the ALJ noted, Logan's credibility was called into question by the fact that she stated that she had suffered from these symptoms since the 1990's (and even made an earlier application for Social Security benefits, which was denied), and yet she worked in 2003-2004.

The ALJ also stated that he had observed Logan at the hearing, and noted that she was capable of sitting, walking, and rising from a chair without difficulty. He noted that his

observations were consistent with those of SSA employees who also observed no difficulties, which further contradicted her allegation of disability. See 20 C.F.R. § 404.1529(c)(3) (adjudicators may consider the observations of other SSA employees); Schaal v. Apfel, 134 F.3d 496, 502 ("Although such observations should be assigned only 'limited weight,' there is no per se legal error where the ALJ considers physical demeanor as one of several factors in evaluating credibility.").

Finally, although Logan relies upon the diagnosis of chronic fatigue syndrome, as "bolstering" her credibility, Pl. Br. at 31, for a person to be found disabled within the meaning of the Act, the presence of a disease or impairment is insufficient. Coleman v. Shalala, 895 F. Supp. 50, 53 (S.D.N.Y. 1995). Instead, she must show that the disease or impairment has caused functional limitations that preclude her from engaging in substantial gainful activity. Rivera v. Harris, 623 F.2d 212, 215-16 (2d Cir. 1980).

The ALJ found that Logan could do her past relevant work as a free-lance writer, editor, researcher, and fact checker. An individual retains the capacity to perform her past relevant work when she can perform the functional demands and duties of the job as she actually performed it or as generally

required by employers throughout the national economy.  Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 1003).  Based upon Logan's descriptions of her past work and the vocational export's testimony, the ALJ found that Logan could perform her light and sedentary past work as she had performed it, or as the jobs are generally performed.

Logan has argued that ALJ's reliance upon the testimony of the vocational expert was inappropriate because the hypothetical questions posed to the vocational expert did not account for all the limitations mentioned by Dr. Enlander and Weitzman.  Pl. Br. at 32-35.  As discussed above, the ALJ reasonably found that Logan did not have additional limitations, and reasonably accorded less than significant weight to the opinions of Dr. Enlander and Weitzman.

The ALJ's hypothetical questions addressed to the vocation expert set forth the limitations he identified, i.e., that Logan was limited to light work that did not require more than occasional postural activities, and no more than occasional overhead reaching with the left arm.  The vocational expert testified that an individual with those limitations could return to Logan's past work as a writer or researcher.  Thus, based upon the vocational expert's testimony, the ALJ reasonably found

31

that Logan could return to her past relevant work.  Cf. Dumas v.
Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983).

## IV.  CONCLUSION

The Commissioner's determination that Logan failed to
demonstrate that she was under a disability within the meaning
of the Social Security Act was supported by substantial
evidence, and is therefore affirmed.

New York, N.Y.
August  $28$ , 2008

ROBERT W. SWEET
U.S.D.J.